IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF NEW MEXICO

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | NO. CR 06-0544 JH[1] |
| | ) | |
| ROBERT LOUIS HAAS, | ) | |
| | ) | |
| Defendant. | ) | |

MEMORANDUM OPINION AND ORDER

**THIS MATTER** came before the Court on Defendant's ("Haas'") Motion to Suppress
Evidence (Doc. 16), filed on April 11, 2006, Motion for Production of Evidence (Doc. 23), filed on
May 9, 2006, and Supplemental Motion to Suppress (Doc. 29), filed on June 5, 2006. On May 23,
2006, I held a hearing, received evidence, and heard arguments. Being otherwise fully advised, I
deny these motions.

**I. Facts.**

On December 6, 2005, United States Border Patrol Agent Adan Monsibaiz was parked in a
marked Border Patrol sedan next to northbound Interstate 25 near mile marker 77. (Tr. 46.) United
States Border Patrol Agent Joel Nickles was at the same location in a separate Border Patrol vehicle.
(*Id*.) The agents were parked perpendicular to the interstate, approximately twenty-four feet from
the pavement with their headlights on, observing northbound traffic. (Tr. 47-48.)

Agent Monsibaiz has been a Border Patrol agent for over seventeen years and has spent all
that time assigned to the Truth or Consequences ("T or C") station. (Tr. 39-40.) For the first three
years, Agent Monsibaiz worked at the T or C Border Patrol checkpoint. (Tr. 40.) After the T or C

---

[1]   At the request of Judge Herrera, I agreed to rule on these motions.

check point became non-permanent, Agent Monsibaiz switched to primarily roving patrol duties. (*Id.*) Since he switched to roving patrol duties, Agent Monsibaiz has been involved in about ten to fifteen apprehensions each month. (Tr. 41.) While on roving patrol duty, Agent Monsibaiz spends approximately 75% of his time patrolling Interstate 25 between mile marker 41 and mile marker 200. (Tr. 41.) The testimony of Agent Monsibaiz was entirely credible.

The segment of Interstate 25 between mile marker 41 and mile marker 200 is a known smuggling route for illegal aliens and narcotics. (Tr. 42-43.) Mile marker 77 lies about 120 miles by road from the international border with the Republic of Mexico. (*Id.*) It sits north of Hatch, New Mexico, where several north/south routes originating in border cities converge. (Tr. 43.) In the two months prior to the stop, there were 65-70 apprehensions involving illegal aliens or narcotics in this area on Interstate 25. (Tr. 44.)

At approximately 5:30 a.m., while it was still dark, Agent Monsibaiz and Agent Nickles observed a white, four door, 1990 Chevrolet Caprice sedan traveling north on Interstate 25. (Tr. 48-49; Exs. 1, 2, and 12.) Both agents noticed that the vehicle was speeding and "riding low" in the rear. (Tr. 51.) "Riding low" means that the rear end of the car was sufficiently closer to the ground relative to the front end that it appeared that the car was "riding heavy in the back end." (*Id.*) Illegal alien smugglers prefer large, older model vehicles similar to the Chevrolet for the obvious reason that more people can be transported therein. (Tr. 56.) The pre-dawn hour was consistent with illegal activity because illegal alien and drug smugglers typically transport their loads under cover of darkness. (Tr. 57.)

The agents, who had their car windows down, simultaneously turned towards each other and asked: "Are you going to get him or am I?" (Tr. 105.) Agent Monsibaiz then pulled out and pursued

the Chevrolet.  (*Id.*)  Agent Nickles followed Agent Monsibaiz. (Tr. 52.)  Agent Monsibaiz had to

drive at 90 to 100 miles per hour to catch up to the Chevrolet at approximately mile marker 80.  (*Id.*)

As he followed the Chevrolet, Agent Monsibaiz confirmed that the car was indeed riding low

in the back and observed it "kind of float over the bumps."  (Tr. 53.)  In Agent Monsibaiz's

experience, this indicated that the Chevrolet had a heavy load or a "bunch of people" in the back seat

or the trunk.  (Tr. 53-54.)  The Chevrolet swerved out of its lane to the right and the left about five

or six times as the agent followed it.  (Tr. 53-54; 56.)  When it swerved to the left, the driver's side

tires completely crossed into the lefthand lane.  (Tr. 54-56.)  When the vehicle swerved to the right,

the passenger's side tires traveled well onto the shoulder such that the tires drove on the shoulder

rumble strips.  (*Id.*)

When he could read the numbers on its New Mexico license plate, Agent Monsibaiz radioed

El Paso dispatch to request registration, stolen vehicle, and border lane checks on the Chevrolet.  (Tr.

75-76.)  The registered owner of the car came back as a person named Cabazos with an address in

Sandia Park, New Mexico.  (Tr. 77.)  The stolen vehicle and border lane checks were negative.  (*Id.*)

As he came up along side the Chevrolet, Agent Monsibaiz had to "back off" as the Chevrolet

swerved across the line dividing the northbound lanes so that the Chevrolet would not hit the Border

Patrol vehicle.  (Tr. 56.)  As Agent Monsibaiz followed, the driver looked back over his shoulder or

in his rearview mirror at Agent Monsibaiz.  (Tr. 57.)

The agent suspected that the Chevrolet contained a large load of illegal aliens in the back seat.

(Tr. 56-57.)  However, as he pulled up alongside the Chevrolet, Agent Monsibaiz saw only the driver.

(Tr. 57.)  The driver did not make eye contact with Agent Monsibaiz.  (Tr. 137.)  The agent was

concerned that the driver might be falling asleep or driving while intoxicated due to the erratic

3

driving.  (Tr. 58.)  The agent decided to stop the vehicle out of concern for the safety of the driver and other motorists, including himself.  (*Id*.)  Agent Monsibaiz radioed Agent Nickles that he intended to stop the Chevrolet to make sure the driver was "okay." (Tr. 60.)

After Agent Monsibaiz initiated his emergency lights, it took about five or six seconds for the driver of the Chevrolet to tap on his brakes and begin to slow down.  (Tr. 60.)  The vehicle stopped at approximately mile marker 84.  (Tr. 76.)  Agent Monsibaiz parked directly behind the Chevrolet, and Agent Nickles parked to the right of Agent Monsibaiz.  (Tr. 60-61.)

Agent Monsibaiz exited his vehicle, approached the Chevrolet and made contact with the driver, who was identified as Haas.  (Tr. at 61.)  Agent Monsibaiz asked Haas if he was a United States citizen.  (*Id*.)  Haas replied: "Yes."  (*Id*.)  Agent Monsibaiz asked Haas if he was "okay" and told him that he had been swerving out of his lane.  (*Id*.)  Haas said that he was "okay" and explained that he had been looking back at Agent Monsibaiz and adjusting his stereo.  (Tr. at 61-62.)

Haas was fumbling nervously with a pack of gum and his breathing was shallow and rapid. (Tr. at 62.)  Agent Monsibaiz asked Haas for his driver's license.  (*Id*.)  As Haas gave Agent Monsibaiz a New Mexico identification card, his hands were shaking.  (*Id*.)  Haas did not produce a driver's license that would allow him to legally operate the Chevrolet.  (*Id*.)

Agent Monsibaiz asked if the Chevrolet belonged to him, and Haas replied that it did.  (Tr. at 63.) Agent Monsibaiz looked into the back seat of the car and saw nothing to explain the fact that the rear of the vehicle was riding low.  (*Id*.)  Agent Monsibaiz asked he could look in the trunk and Haas replied: "No."  *Id*.  Agent Monsibaiz asked what was in the trunk and Haas responded that he didn't know.  (Tr. at 64.)

The spare tire was sitting directly behind the driver's seat on the floorboard.  (Tr. at 64; Ex.

3.)  Agent Monsibaiz asked Haas why the tire was in the backseat area and not in the trunk.  (Tr. at 64.)  Haas replied: "Because there's no room in the trunk." (*Id.*).  Agent Monsibaiz asked: "Well, why is there no room?"  (*Id.*)  Haas responded: "Because there's bags in there." (*Id.*) Agent Monsibaiz asked: "Well, what's in the bags?" (*Id.*)  Haas replied: "You will see when you get [a] search warrant." *Id.*

Agent Monsibaiz contacted the New Mexico State Police because Haas had not produced a valid driver's license.  (Tr. at 65-66.)  The New Mexico State Police dispatch informed Agent Monsibaiz that an officer would respond.  (*Id.*)

While they waited for the New Mexico State Police officer to arrive, Agent Monsibaiz and Agent Nickles stood between their vehicles, immediately behind the Chevrolet. (Tr. 66.)  As the wind shifted, they could smell marijuana "a little bit." (*Id.*)  Agent Monsibaiz and Agent Nickles followed the scent to the rear of the Chevrolet, where they smelled marijuana at the seam of the trunk and the fender.  (*Id.*)  After the agents smelled the marijuana odor emanating from the vehicle's trunk, the agents radioed for a drug detection canine unit.  (Tr. at 67.) When the dog arrived, it alerted to the trunk of the Chevrolet.  (*Id.*)

Haas was arrested and transported, along with the Chevrolet, to the Border Patrol checkpoint at mile marker 82 on Interstate 25.  (Tr. at 67.)  At the checkpoint, agents searched the Chevrolet and discovered several burlap bags and backpacks containing approximately 362 pounds of marijuana in the trunk.  (Tr. at 7-8 and 67-68; Exs. 4, 5, and 6.)

Agents measured and photographed the Chevrolet with and without the marijuana in the trunk.  (Tr. at 69-72; Exs. 7 and 8 .)  The photographs establish that (1) the rear bumper was three inches lower with the marijuana in the trunk than when it was unloaded, (2) the clearance of the rear

right tire well was two inches less with the marijuana in the trunk than it was unloaded; and (3) the front bumper was one inch higher with the marijuana in the trunk than it was unloaded. (Tr. at 70-71; Exs. 7, 8, 9, 10, 13, 14, 15, and 16.)

DEA Task Force Officer Michael Avilucea was the case agent responsible for collecting evidence and arranging for storage of items, including the Chevrolet, that were not taken as evidence. (Tr. 7-8.) Officer Avilucea contacted a local towing company, Martin Motors, and arranged for them to tow the vehicle to their lot and store it. (Tr. 12; Ex. 12.) The Chevrolet was not taken into evidence because it did not appear to have evidentiary value. (Tr. 27.) When the Chevrolet was towed from the checkpoint, the tow truck driver signed a form indicating that the towing company was taking custody of the vehicle. (Tr. 13.) According to the standard law enforcement practice in the area, the towing company was responsible for securing the vehicle on their lot until the case agent authorized its disposal or the towing company instituted a civil forfeiture action against the vehicle and its owner. (Tr. 17-18.) Officer Avilucea did not authorize disposal of the Chevrolet. (Tr. 18; 21.)

On March 2 2006, Officer Avilucea was contacted by United States Probation Officer Mitzi Wyatt, who supervised Haas while he was on pretrial release. (Tr. 19.) Officer Wyatt had contacted Martin Motors regarding the Chevrolet and been told that it could not be located. (*Id.*) On March 8, 2006, Officer Avilucea contacted Martin Motors, in an attempt to locate the Chevrolet. (*Id.*) Martin Motors stated that they could not locate the Chevrolet, but they would review their records. (*Id.*) Officer Avilucea contacted Martin Motors two more times in late March and early April 2006. (Tr. 20.) A Martin Motors employee informed Officer Avilucea that the Chevrolet had been stolen. (*Id.*) On April 25, 2006, Martin Motors filed a police report with Sierra County Sheriff's Office. (Tr.

21.)  The Chevrolet has not been recovered.  (*Id.*)

Haas moved to suppress the evidence on the grounds that (1) the stop was unsupported by reasonable suspicion; and (2) evidence that the vehicle was riding low should be disregarded because the Government failed to preserve the evidence.

## II.  Discussion.

### A.  Whether the stop violated the Fourth Amendment.

The Fourth Amendment prohibits unreasonable searches and seizures by the Government. U.S. Const. amend. IV.  Its protections extend to brief investigatory stops of persons or vehicles that fall short of traditional arrest.  *United States v. Arvizu*, 534 U.S. 266, 273 (2002).  Investigative stops of vehicles are governed by the principles announced in *Terry v. Ohio*, 392 U.S. 1, 19-21 (1968). In this case, the stop was based on safety concerns and reasonable suspicion of criminal activity.

Agent Monsibaiz decided to stop the Chevrolet because he was concerned that the driver was intoxicated or falling asleep at the wheel.  "Encounters are initiated by the police for a wide variety of purposes, some of which are wholly unrelated to the desire to prosecute for crime." *Terry*, 392 U.S. at 13.  The Tenth Circuit has recognized that law enforcement officers may stop or detain individuals to prevent them from harming themselves or others pursuant to the "community caretaking functions" of law enforcement officers.  *United States v. Garner*, 416 F.3d 1208, 1213 (10th Cir. 2005); *see also United States v. King*, 990 F.2d 1552, 1560 (10th Cir.1993).

Like other investigative detentions, a community caretaking stop is subject to the principles of *Terry*.  *Garner*, 416 F.3d at 1213.  The detention must be based upon "specific and articulable facts which . . . reasonably warrant [an] intrusion into the individual's liberty." *Id.* (*quoting King*, 990 F.2d at 1560 and *Terry*, 392 U.S. at 21).  The government's interest must outweigh the individual's

interest in being free from arbitrary governmental interference.  *Garner*, 416 F.3d at 1213.

The Chevrolet was speeding and swerving outside of its driving lane.  Agent Monsibaiz had to back off at one point in order to avoid a collision.  The predawn hour supported the concern that the driver was falling asleep or on the way home from a night of partying.  These specific and articulable facts supported Agent Monsibaiz's concern that the driver posed a danger to himself and the motoring public, including the agent.  The governmental interest of highway safety outweighed the driver's interest in being free from interference.  The stop was reasonable pursuant to the agent's community caretaking function.

The roving patrol stop in this case was not based solely on community caretaking functions, but also on reasonable suspicion of criminal activity.  *See United States v. Gandara-Salinas*, 327 F.3d 1127, 1129 (10th Cir.2003) (*citing Arvizu*, 534 U.S. at 273).  The following factors are relevant to the determination of whether an immigration stop is supported by reasonable suspicion:

> (1) characteristics of the area in which the vehicle is encountered; (2) the proximity of the area to the border; (3) the usual patterns of traffic on the particular road; (4) the previous experience of the agent with alien traffic; (5) information about recent illegal border crossings in the area; (6) the driver's behavior, including any obvious attempts to evade officers; (7) aspects of the vehicle, such as a station wagon with concealed compartments; and (8) the appearance that the vehicle is heavily loaded.

*Gandara-Salinas*, 327 F.3d at 1129-30 (*citing United States v. Monsivais*, 907 F.2d 987, 989-90 (1990) and *United States v. Brignoni-Ponce*, 422 U.S. 873, 884-85 (1975)).

In evaluating these factors, a court may not employ a "divide-and-conquer" approach by evaluating and rejecting each factor in isolation.  *Arvizu*, 534 U.S. at 277.  The ultimate determination of reasonable suspicion depends upon the totality of the circumstances. *Gandara-Salinas*, 327 F.3d at 1130.  A border patrol officer may use his experience and training in detecting illegal entry and

smuggling when assessing these factors. *Gandara-Salinas*, 327 F.3d at 1129. A court must defer to the officer's ability to distinguish between innocent and suspicious actions. *United States v. De la Cruz-Tapia*, 162 F.3d 1275, 1277-78 (10th Cir.1998).

Interstate 25 runs north from the international border with Mexico. Mile marker 77 on Interstate 25 lies north of a point where several known alien and drug smuggling routes converge. The stop occurred approximately 120 miles from the border. See *United States v. Pacheco-Espinosa*, 121 Fed.Appx. 352 (10th Cir.2005) (unpublished decision) (holding that 120 miles was a "reasonable" distance from the border for the *Brignoni-Ponce* analysis). In the two months prior to the stop, more than 65 stops involving illegal aliens or narcotics had occurred in this area on Interstate 25. Agent Monsibaiz had significant experience as a roving patrol agent in that area.

The driver was speeding and swerving. The Chevrolet was the type and size of automobile often used by alien and drug smugglers. The Chevrolet was riding low in the back; so low that both agents immediately noticed that the vehicle was suspicious as it sped by their position at the rate of 85 miles per hour. Measurements taken when the vehicle was parked confirm that when the Chevrolet was loaded with marijuana, the rear was three inches lower and the front was one inch higher than when the vehicle was unloaded.

Haas invites the Court to evaluate and reject each factor in isolation; an approach rejected by *Arvizu*. Based on the totality of the circumstances, the roving patrol stop was supported by reasonable suspicion.

The detention lasted no longer than was necessary to effectuate the purpose of the stop and the detention was reasonably related in scope to the circumstances that justified the interference in the first place. *See Florida v. Royer*, 460 U.S. 491, 500 (1983). When Agent Monsibaiz approached

9

the Chevrolet, Haas was fumbling with a pack of gum and his breathing was rapid and shallow. Agent Monsibaiz asked him about his citizenship and whether he was okay because Haas had been swerving outside his lane.  After Haas explained that he had been looking back at the agent and had been adjusting his stereo, Agent Monsibaiz asked for a driver's license.  Haas instead gave him a New Mexico identification card.

After Haas failed to produce a valid driver's license, Agent Monsibaiz contacted the New Mexico State Police.  While awaiting their arrival, Agent Monsibaiz and Agent Nickles smelled the odor of marijuana and determined that it was emanating from the trunk of the Chevrolet.  Combined with the other suspicious factors discussed above, the detection of the odor of marijuana was sufficient grounds upon which to detain Haas.  *United States v. West*, 219 F.3d 1171, 1178 (10th Cir.2000); *United States v. Ozbirn*, 189 F.3d 1194, 1200 (10th Cir.1999).  After the agents smelled marijuana, they were justified in prolonging the detention and requesting the canine unit to arrest Haas and search the Chevrolet.

**B. Whether evidence that the vehicle was riding low should be disregarded.**

The Supreme Court has "specified that, to the extent the Constitution imposes a duty upon the government to preserve evidence, 'that duty must be limited to evidence that might be expected to play a significant role in the suspect's defense'- i.e., evidence that is constitutionally material." *United States v. Parker*, 72 F.3d 1444,1451 (10th Cir.1995) (*quoting California v. Trombetta*, 467 U.S. 479, 488-89 (1984)).  In order to qualify as constitutionally material, evidence must: (1) "possess an exculpatory value that was apparent [to the police] before the evidence was destroyed," and (2) "be of such a nature that the defendant would be unable to obtain comparable evidence by other reasonably available means." *Trombetta*, 467 U.S. at 489.

The mere possibility that lost or destroyed evidence could have exculpated a defendant is insufficient to satisfy Trombetta 's requirement that the exculpatory value be "apparent" to the police before destruction. *Parker*, 72 F.3d at 1451 (*quoting Arizona v. Youngblood*, 488 U.S. 51, 56 (1988)). Additionally, "if the exculpatory value of the evidence is indeterminate and all that can be confirmed is that the evidence was 'potentially useful' for the defense, then a defendant must show that the government acted in bad faith in destroying the evidence." *United States v. Bohl*, 25 F.3d 904, 910 (10th Cir.1994) (*citing Youngblood*, 488 U.S. at 58). "[M]ere negligence on the government's part in failing to preserve such evidence is inadequate for a showing of bad faith." *Bohl*, 25 F.3d at 912.

Haas contends the loss of the Chevrolet prevents defense experts from conducting weight testing on the car to prove that the agents' statements that the Chevrolet was riding low are inaccurate. The exculpatory value of such testing was and is not apparent; the fact that the Chevrolet appeared heavily loaded when the marijuana was in the trunk is independently established by the photographs.

Even if Haas could show that the exculpatory value of the vehicle was apparent before it was lost, there is no evidence that the Government failed to act reasonably in securing the vehicle in storage or otherwise acted in bad faith. The undisputed testimony of Officer Avilucea established that the Government did not authorize disposal of the Chevrolet. The record is undisputed that the vehicle was stolen from Martin Motors. It is impossible for the Government to produce the Chevrolet in light of the theft. The overall circumstances do not suggest bad faith by the Government. Photographs and measurements were taken of the Chevrolet with the marijuana in the truck and after it was unloaded. The motion to produce evidence must be denied.

11

Haas argues that the vehicle evidence should be given less weight because testimony of Agent Monsibaiz concerning time elapsed and distance traveled during the encounter was not credible. The agent testified that the times and distances were approximate. The testimony of Agent Monsibaiz was entirely credible. Evidence that the vehicle was riding low should not be disregarded.

**WHEREFORE,**

**IT IS ORDERED** that Defendant's Motion to Suppress Evidence (Doc. 16), filed on April 11, 2006, Defendant's Motion for Production of Evidence (Doc. 23), filed on May 9, 2006, Defendant's Supplemental Motion to Suppress (Doc. 29), filed on June 5, 2006, are **DENIED**.

_____
**ROBERT C. BRACK**
**UNITED STATES DISTRICT JUDGE**